**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| WILLIAM DAVID SROUFE,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Civil Action No. 3:26cv823<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff William David Sroufe ("Dr. Sroufe"), by counsel, states the following as his Complaint against Wells Fargo Bank, N.A. ("Wells Fargo").

## NATURE OF THE ACTION

1. This is a consumer action arising from the December 17, 2025 takeover of Dr. Sroufe's Wells Fargo accounts by a criminal impersonating Wells Fargo's own fraud department. During a single 58-minute telephone call that spoofed Wells Fargo's customer-service number, Dr. Sroufe's online-banking password was changed, his debit-card spending limit was raised to $20,000, a $3,600 cash advance was drawn against his Wells Fargo credit card, and approximately $18,900 was stripped from his deposit accounts — all while Wells Fargo's own fraud-detection systems were flagging the activity in real time. Wells Fargo then denied Dr. Sroufe's fraud claims within days, without ever speaking to him, and to this day collects the fraudulent credit-card debt and reports it to the credit bureaus as delinquent.

2. Dr. Sroufe seeks to recover everything the fraud and Wells Fargo's conduct took from him. He sues under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and Regulation E, 12 C.F.R. pt. 1005; the Truth in Lending Act ("TILA"), including the Fair Credit Billing Act ("FCBA"), 15 U.S.C. §§ 1640, 1643, 1666, 1666a, and Regulation Z, 12 C.F.R. pt. 1026; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b); and Virginia common law.

**JURISDICTION AND VENUE**

3. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Dr. Sroufe asserts claims under the EFTA, TILA, and the FCRA, each of which authorizes suit in a United States district court. 15 U.S.C. §§ 1693m(g), 1640(e), 1681p.

4. The Court also has diversity jurisdiction under 28 U.S.C. § 1332(a): Dr. Sroufe is a citizen of Virginia; Wells Fargo is a national banking association whose main office is in San Francisco, CA, making it a citizen of California; and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they arise from the same transactions and occurrences and form part of the same case or controversy.

6. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here: Dr. Sroufe received the imposter call, maintained his accounts, and suffered his losses in Hanover County, Virginia, where Wells Fargo operates branches and transacts business. Assignment to the Richmond Division is proper under Local Civil Rule 3(B)(4) and (C).

## PARTIES

7. Dr. Sroufe is a natural person residing in Hanover County, Virginia. He is a "consumer" within the meaning of 15 U.S.C. §§ 1693a(6), 1602(i), and 1681a(c). He established and used each account at issue primarily for personal, family, or household purposes.

8. Wells Fargo is a national banking association with its main office in San Francisco, CA, and branches throughout Virginia, including in this district and division. At all relevant times Wells Fargo was a "financial institution" within the meaning of 15 U.S.C. § 1693a(9) and 12 C.F.R. § 1005.2(i); a "card issuer" and "creditor" within the meaning of 15 U.S.C. § 1602(o) and (g) and 12 C.F.R. § 1026.2(a); and a "furnisher" of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

## FACTS

### A. The accounts

9. Dr. Sroufe held four Wells Fargo accounts: a consumer checking account ending 8310, a linked consumer savings account, a debit card ending 9318, and a Visa credit-card account ending 8712.

10. The checking and savings accounts are "accounts" within the meaning of 15 U.S.C. § 1693a(2) and 12 C.F.R. § 1005.2(b)(1). The Visa account is an open-end consumer credit plan subject to TILA and Regulation Z.

### B. The imposter call and the takeover of Dr. Sroufe's accounts

11. On December 17, 2025 at 5:43 p.m. Eastern time, Dr. Sroufe received a telephone call that lasted 58 minutes. The caller ID displayed "WELLS FARGO," and the call was spoofed to appear to originate from 800-869-3557 — Wells Fargo's own customer-service number.

12. The caller impersonated Wells Fargo's fraud-prevention department, told Dr. Sroufe that his accounts had been compromised, and walked him through purported "security" steps while the imposter took control of his online-banking credentials and accounts.

13. Wells Fargo's own automated systems documented the takeover in real time. At 5:51 p.m. — eight minutes into the call — Wells Fargo emailed Dr. Sroufe that his online-banking password had been changed. (Exhibit A.) Dr. Sroufe did not change his password; it was changed in the course of the imposter's takeover of his credentials.

14. At 6:11 p.m., Wells Fargo emailed Dr. Sroufe thanking him for "verifying" flagged transactions on debit card 9318. (Exhibit B.) Dr. Sroufe did not verify those transactions as his own.

15. At 6:16 p.m., Wells Fargo emailed Dr. Sroufe that the daily purchase limit on card 9318 had been raised to $20,000.00 "as requested." (Exhibit C.) Dr. Sroufe made no such request.

16. At 6:17 p.m., Wells Fargo's fraud-detection system emailed Dr. Sroufe that a $6,000.00 "CASH APPW" transaction had been declined as unusual activity. (Exhibit D.) Wells Fargo was thus aware, in real time and from its own systems, of circumstances indicating that unauthorized transfers were being attempted on Dr. Sroufe's accounts.

**C. The unauthorized transfers and the unauthorized cash advance**

17. During the call, and without Dr. Sroufe's knowledge or authorization, funds were transferred from his savings account into checking account 8310 to stage them for theft. Dr. Sroufe did not initiate, request, or authorize those transfers.

18. During the same call, a cash advance of $3,600.00 was drawn on Dr. Sroufe's Visa account 8712 and deposited into checking account 8310. Dr. Sroufe did not initiate, request,

or authorize the advance, present his card for it, or benefit from it. Wells Fargo's own December 26, 2025 letter states that the reported unauthorized transactions "took place online." (Exhibit E.)

19. Approximately $18,900.00 was then transferred out of checking account 8310 through a series of Cash App transactions executed at the imposter's direction while the imposter controlled Dr. Sroufe's online-banking session and credentials. The full extent to which the imposter, rather than Dr. Sroufe, physically initiated each outbound transfer will be established from Wells Fargo's session, device, and IP records, which Wells Fargo has refused to produce despite repeated written demands.

20. On information and belief, the successful outbound transfers were executed after Wells Fargo's fraud systems had flagged and declined the $6,000.00 Cash App attempt at 6:17 p.m., and after the daily limit on the account's card had been raised minutes earlier; the precise sequence and timestamps of each transaction are recorded in Wells Fargo's own transaction, session, and device records.

21. Dr. Sroufe received no benefit from any of these transactions. His accounts were used solely as a conduit through which the imposter stole his money.

**D. Same-day notice and Wells Fargo's sham investigation**

22. Dr. Sroufe discovered the fraud and reported it to Wells Fargo the same day, December 17, 2025. Wells Fargo opened a claim on his deposit accounts that day.

23. Dr. Sroufe also promptly reported the crime to the Hanover County Sheriff's Office, which assigned report number 25-704635.

24. Wells Fargo opened a credit-card fraud claim on December 20, 2025. Six days later, by letter dated December 26, 2025, its Credit Card Fraud Claims unit announced it had found "no evidence of fraud" and referred the matter to its Online Fraud Department because the

transactions "took place online." The letter announced that conclusion without explaining any findings or identifying anything Wells Fargo had examined. (Exhibit E.)

25. By form letter dated December 30, 2025, Wells Fargo denied the deposit-account claim in full. The letter announced the denial without explaining the findings on which it rested. Wells Fargo has never credited or recredited any portion of the $18,900.00 to Dr. Sroufe's accounts. (Exhibit F.)

26. On December 31, 2025, Wells Fargo's Online Fraud Department denied and closed the credit-card claim. (Exhibit G.)

27. Wells Fargo reached these denials without ever interviewing Dr. Sroufe. Its only investigative contact was a single telephone call to his wife. It never requested the police report, although Dr. Sroufe supplied the report number and details in his written submissions. In its written response to Dr. Sroufe's Consumer Financial Protection Bureau complaint, Wells Fargo admitted that its four attempts to contact him — on January 2, 6, 8, and 13, 2026 — all came after it had already denied his claim.

28. Wells Fargo never reconciled its denials with its own system records: the mid-call password change, the "verification" of flagged transactions, the $20,000 limit increase, and its own fraud alert declining a $6,000 Cash App transaction as unusual activity.

29. Dr. Sroufe demanded in writing, at least three times, the records and documents on which Wells Fargo relied in denying his claims. Wells Fargo has never produced them, and, on information and belief, never notified Dr. Sroufe of his right to request the documents it relied upon.

30. A Wells Fargo representative told Dr. Sroufe that the bank's position was that he had "benefited" from the fraud because the stolen funds passed through his own accounts.

**E. Dr. Sroufe's written disputes and administrative complaints**

31. On December 31, 2025, Dr. Sroufe filed two detailed written complaints with the Consumer Financial Protection Bureau — no. 251231-27331721 (deposit accounts) and no. 251231-27332004 (credit card) — with supporting documents attached, including the Hanover County Sheriff's Office report number. The CFPB transmitted both complaints to Wells Fargo, and Wells Fargo received, acknowledged, and responded to both on the merits. The credit-card complaint was submitted within sixty days after Wells Fargo transmitted the first periodic statement reflecting the $3,600.00 cash advance.

32. On January 13, 2026, Wells Fargo's executive office — its "SAGE" escalation unit, described as the bank's highest level of review — responded to both complaints and affirmed the denials. Dr. Sroufe filed a further CFPB complaint, no. 260113-27732156, and a complaint with the Office of the Comptroller of the Currency's Customer Assistance Group, case no. CS0416261, and submitted written rebuttals. Wells Fargo again affirmed its denials.

**F. Wells Fargo's continuing collection and credit reporting**

33. Wells Fargo continues to treat the $3,600.00 cash advance, plus accruing interest and fees, as a debt Dr. Sroufe owes. It has demanded payment of the disputed amount through periodic statements that, on information and belief, did not indicate that payment of the disputed amount was not required pending resolution of the dispute, and through other collection activity, throughout the pendency of his written disputes and to this day.

34. Wells Fargo furnishes the Visa account to consumer reporting agencies as delinquent, without, on information and belief, reporting that the amount is disputed.

35. In or before July 2026, Dr. Sroufe disputed the delinquent tradeline in writing through at least one of the nationwide consumer reporting agencies, and that agency transmitted

the dispute to Wells Fargo pursuant to 15 U.S.C. § 1681i(a)(2). Wells Fargo verified the tradeline as accurate, and the delinquency remains on his credit reports.

36. As a direct and proximate result of the conduct alleged above, Dr. Sroufe has suffered actual damages including the $18,900.00 taken from his deposit accounts; the $3,600.00 cash advance and all interest, fees, and charges assessed on it; damage to his credit standing and credit scores, which continue to fall; and inconvenience, aggravation, and emotional distress.

## COUNT I — ELECTRONIC FUND TRANSFER ACT: UNAUTHORIZED TRANSFERS, 15 U.S.C. §§ 1693g, 1693m; 12 C.F.R. § 1005.6

37. Dr. Sroufe incorporates the foregoing paragraphs.

38. The transfers from Dr. Sroufe's savings and checking accounts described above — including the internal staging transfers and the outbound Cash App transfers — were "electronic fund transfers" within the meaning of 15 U.S.C. § 1693a(7) and 12 C.F.R. § 1005.3(b).

39. Each transfer initiated by the imposter was an "unauthorized electronic fund transfer" within the meaning of 15 U.S.C. § 1693a(12) and 12 C.F.R. § 1005.2(m): it was initiated by a person other than Dr. Sroufe, without actual authority to initiate it, and Dr. Sroufe received no benefit from it.

40. An unauthorized electronic fund transfer includes a transfer initiated by a person who obtained the access device or account credentials from the consumer through fraud or robbery. 12 C.F.R. pt. 1005, Supp. I, cmt. 2(m)-3. The Consumer Financial Protection Bureau has confirmed that electronic fund transfers initiated with account-access information obtained by deception — including by a third party calling the consumer and pretending to be a representative of the consumer's own financial institution — are unauthorized electronic fund

transfers under Regulation E. CFPB, Electronic Fund Transfers FAQs, Unauthorized EFTs, Questions 5–6.

41. Dr. Sroufe notified Wells Fargo of the unauthorized transfers the same day they occurred. Under 15 U.S.C. § 1693g and 12 C.F.R. § 1005.6, his liability for the unauthorized transfers cannot exceed $50 — and it is zero to the extent Wells Fargo failed to satisfy the statutory conditions of consumer liability, or was notified of, or otherwise became aware of, circumstances leading to a reasonable belief that unauthorized transfers had been or might be effected before the transfers were completed, as its own 6:17 p.m. declined-transaction fraud alert reflects. 15 U.S.C. § 1693g(a); 12 C.F.R. § 1005.6(b)(5)(iii).

42. In any action, the burden of proof is upon Wells Fargo to establish that the transfers were authorized and that the conditions of consumer liability were met. 15 U.S.C. § 1693g(b).

43. Wells Fargo nevertheless imposed the full loss of the unauthorized transfers on Dr. Sroufe and has failed and refused to recredit his accounts, in violation of 15 U.S.C. §§ 1693g and 1693f and 12 C.F.R. § 1005.6.

44. Dr. Sroufe is entitled to his actual damages of at least $18,900.00, statutory damages, and his costs and reasonable attorney's fees. 15 U.S.C. § 1693m(a).

## COUNT II — ELECTRONIC FUND TRANSFER ACT: ERROR RESOLUTION AND TREBLE DAMAGES, 15 U.S.C. § 1693f; 12 C.F.R. § 1005.11

45. Dr. Sroufe incorporates the foregoing paragraphs.

46. Dr. Sroufe's December 17, 2025 same-day report, and his subsequent detailed written complaints transmitted to Wells Fargo, were notices of error within the meaning of 15 U.S.C. § 1693f(a) and 12 C.F.R. § 1005.11(b).

47. Wells Fargo was required to investigate the alleged errors promptly and in good faith and to determine whether an error occurred, and its investigation could not ignore material information in its own records bearing on the claim. 15 U.S.C. § 1693f; 12 C.F.R. § 1005.11(c); 12 C.F.R. pt. 1005, Supp. I, cmt. 11(c)(4)-5. Upon determining that no error occurred, Wells Fargo was further required to provide a written explanation of its findings, to notify Dr. Sroufe of his right to request the documents it relied on, and to provide those documents promptly upon request. 15 U.S.C. § 1693f(d); 12 C.F.R. § 1005.11(d)(1).

48. Wells Fargo's investigation did not satisfy those requirements. It denied the deposit claim in eight business days and the credit-card claim in six days, on the basis of form letters that announced conclusions — "no evidence of fraud" — without explaining any findings; it never interviewed Dr. Sroufe; it never obtained the police report; its four contact attempts all post-dated its denial; and its determination ignored material information in Wells Fargo's own records — the password change, the limit increase, the "verified" transactions, and its own declined-transaction fraud alert.

49. Wells Fargo further violated 15 U.S.C. § 1693f(d) and 12 C.F.R. § 1005.11(d)(1): its denial letters did not explain the findings on which they rested; on information and belief, Wells Fargo never notified Dr. Sroufe of his right to request the documents on which it relied; and Wells Fargo failed and refused to provide those documents in response to Dr. Sroufe's three written requests for the records and documents on which it relied in denying his claims.

50. Wells Fargo knowingly and willfully concluded that Dr. Sroufe's accounts were not in error when that conclusion could not reasonably have been drawn from the evidence available to it at the time of its investigation — including its own contemporaneous records of

the password change, the limit increase, and its declined-transaction fraud alert. 15 U.S.C. § 1693f(e)(2).

51. In the alternative, to the extent Wells Fargo did not in fact complete a good-faith determination within ten business days of Dr. Sroufe's notice, Wells Fargo failed to provisionally recredit Dr. Sroufe's account as required by 15 U.S.C. § 1693f(c), and it did not make a good-faith investigation of the alleged errors and lacked a reasonable basis for believing that the accounts were not in error. 15 U.S.C. § 1693f(e)(1).

52. Dr. Sroufe is accordingly entitled to treble his actual damages under 15 U.S.C. § 1693f(e) — three times $18,900.00, or $56,700.00 — together with statutory damages, costs, and reasonable attorney's fees under 15 U.S.C. § 1693m(a).

## **COUNT III — TRUTH IN LENDING ACT: UNAUTHORIZED USE OF A CREDIT CARD, 15 U.S.C. §§ 1643, 1640**

53. Dr. Sroufe incorporates the foregoing paragraphs.

54. The $3,600.00 cash advance was the "unauthorized use" of Dr. Sroufe's credit card within the meaning of 15 U.S.C. § 1602(p): use by a person other than the cardholder who had no actual, implied, or apparent authority, and from which Dr. Sroufe received no benefit. Use of a credit card obtained through fraud is never authorized use. 12 C.F.R. pt. 1026, Supp. I, cmt. 12(b)(1)(ii)-4.

55. The advance was initiated through the online-banking channel — as Wells Fargo's own December 26, 2025 letter concedes — using credentials the imposter obtained from Dr. Sroufe by fraud during the call. Neither the card itself nor Dr. Sroufe's signature, personal identification number, or photograph was presented, and, on information and belief, no other sufficient means of identifying Dr. Sroufe as the cardholder — as distinct from credentials stolen minutes earlier — accompanied the transaction. Dr. Sroufe's maximum liability for the

unauthorized use is accordingly zero. 15 U.S.C. § 1643(a); 12 C.F.R. § 1026.12(b)(2)(iii); 12 C.F.R. pt. 1026, Supp. I, cmt. 12(b)(2)(iii)-3.

56. In any action, Wells Fargo bears the burden of proving that the use was authorized and that the conditions of cardholder liability under 15 U.S.C. § 1643(a) were met. 15 U.S.C. § 1643(b).

57. Notwithstanding § 1643, Wells Fargo has imposed and continues to impose liability for the unauthorized use on Dr. Sroufe — by maintaining the $3,600.00 advance and its associated interest and fees on his account, demanding payment through periodic statements, engaging in collection activity, and reporting the balance as delinquent.

58. Wells Fargo's imposition of liability in violation of 15 U.S.C. § 1643 is actionable under 15 U.S.C. § 1640(a). Dr. Sroufe is entitled to his actual damages, statutory damages, and his costs and reasonable attorney's fees, together with a declaration that he owes nothing on the advance.

## COUNT IV — FAIR CREDIT BILLING ACT, 15 U.S.C. §§ 1666, 1666a; 12 C.F.R. § 1026.13

59. Dr. Sroufe incorporates the foregoing paragraphs.

60. The $3,600.00 cash advance was a "billing error" within the meaning of 15 U.S.C. § 1666(b)(1) and 12 C.F.R. § 1026.13(a)(1): an extension of credit to a person without actual, implied, or apparent authority to use the account, "even if the cardholder received benefit" from the extension.

61. Dr. Sroufe gave Wells Fargo timely written notice of the billing error. His written CFPB complaint of December 31, 2025 — submitted within sixty days after transmission of the first periodic statement reflecting the advance — identified him, his account, and the nature, date, and amount of the error. The CFPB transmitted the complaint to Wells Fargo through the

company portal Wells Fargo maintains for that purpose, and, on information and belief, Wells Fargo routed it to the units responsible for resolving billing and fraud inquiries on the account.

62. Wells Fargo received, acknowledged, investigated, and twice substantively resolved the dispute on the merits, through its highest level of escalation, without ever objecting to the manner or address of delivery. By that conduct Wells Fargo waived, and is estopped from asserting, any objection that the notice was not received at a designated billing-inquiry address. In the alternative, and on information and belief, Wells Fargo failed to clearly and conspicuously disclose on the relevant periodic statements an exclusive address for billing-error notices.

63. Wells Fargo failed to conduct a reasonable investigation before denying the dispute, 12 C.F.R. § 1026.13(f); failed to provide a written explanation adequately setting forth the reasons for its denial; and failed to credit the disputed amount and related charges as required. 12 C.F.R. § 1026.13(e); 12 C.F.R. pt. 1026, Supp. I, cmt. 13(c)(2)-2.

64. Wells Fargo never resolved the dispute in compliance with § 1666's procedures. Throughout and after the pendency of the dispute, it demanded payment of the disputed amount through periodic statements that, on information and belief, did not indicate that payment of the disputed amount was not required pending resolution; imposed and collected interest and fees on the disputed amount; and reported the disputed amount as delinquent to consumer reporting agencies without reporting it as disputed — in violation of 15 U.S.C. §§ 1666(c), (d), and 1666a and 12 C.F.R. § 1026.13(d)(1), (2).

65. By reason of its failures to comply with the FCBA, Wells Fargo (a) forfeited its right to collect the disputed amount to the extent provided by 15 U.S.C. § 1666(e); and (b) is obligated to credit the entire disputed amount and related finance and other charges to Dr. Sroufe's account, having failed to conduct the reasonable and timely investigation the Act

requires. 12 C.F.R. § 1026.13(e); 12 C.F.R. pt. 1026, Supp. I, cmt. 13(c)(2)-2. Wells Fargo is further liable for Dr. Sroufe's actual damages, statutory damages under 15 U.S.C. § 1640(a)(2)(A)(iii) for each violation to the extent permitted by 15 U.S.C. § 1640(g), and his costs and reasonable attorney's fees. 15 U.S.C. § 1640(a).

## COUNT V — FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681s-2(b)

66. Dr. Sroufe incorporates the foregoing paragraphs.

67. Wells Fargo furnished information about the Visa account to one or more consumer reporting agencies, reporting the fraud-tainted balance as delinquent.

68. Dr. Sroufe disputed the accuracy of that reporting with a consumer reporting agency, and the agency notified Wells Fargo of the dispute pursuant to 15 U.S.C. § 1681i(a)(2).

69. Upon receiving that notice, Wells Fargo was required to conduct a reasonable investigation, to review all relevant information provided by the agency, to report the results, and to modify, delete, or permanently block the reporting of information it could not verify as accurate. 15 U.S.C. § 1681s-2(b)(1).

70. Wells Fargo instead verified the delinquent tradeline without any substantive examination of the merits of the dispute — despite possessing its own system records documenting the account takeover, Dr. Sroufe's consistent same-day fraud reports, and the police-report number and details he supplied in his written submissions — and continued to report the account as delinquent.

71. Wells Fargo's conduct violated 15 U.S.C. § 1681s-2(b) negligently and willfully. Dr. Sroufe is entitled to his actual damages — including damage to his credit standing and credit scores and emotional distress — or statutory damages of $100 to $1,000, punitive damages, and his costs and reasonable attorney's fees. 15 U.S.C. §§ 1681n, 1681o.

**COUNT VI — BREACH OF CONTRACT**

72. Dr. Sroufe incorporates the foregoing paragraphs. This Count is pleaded in the alternative and to the extent not inconsistent with federal law.

73. Dr. Sroufe's deposit accounts were governed by Wells Fargo's consumer deposit-account agreement, under which Wells Fargo agreed, among other things, to honor only authorized transactions on the accounts and to comply with the error-resolution and consumer-liability provisions of Regulation E, which are incorporated into the agreement.

74. Wells Fargo breached the agreement by paying out unauthorized transfers from Dr. Sroufe's accounts; by failing to act on its own contemporaneous fraud alerts to protect the accounts; by refusing to recredit the accounts after notice; and by failing to conduct the investigation the agreement and incorporated regulations required.

75. As a direct and proximate result, Dr. Sroufe suffered damages of at least $18,900.00, plus interest.

**COUNT VII — CONVERSION**

76. Dr. Sroufe incorporates the foregoing paragraphs. This Count is pleaded in the alternative.

77. Dr. Sroufe owned and was entitled to possess the funds on deposit in his checking and savings accounts. Wells Fargo wrongfully exercised dominion and control over those funds by transferring them out of his accounts without authorization and by refusing, after immediate notice of the fraud, to restore them.

78. Wells Fargo's conduct proximately caused Dr. Sroufe the loss of approximately $18,900.00, plus interest, for which he is entitled to compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Sroufe requests that the Court enter judgment against Wells Fargo as follows:

A. Actual damages of not less than $22,500.00 — the $18,900.00 taken from his deposit accounts and the $3,600.00 unauthorized cash advance together with all interest, fees, and charges assessed on it — and such further actual damages as are proven at trial;

B. Treble damages under 15 U.S.C. § 1693f(e);

C. Statutory damages under 15 U.S.C. § 1693m(a)(2)(A); statutory damages under 15 U.S.C. § 1640(a)(2)(A)(iii) for each violation to the extent permitted by 15 U.S.C. § 1640(g); and statutory damages under 15 U.S.C. § 1681n(a)(1)(A);

D. Punitive damages under 15 U.S.C. § 1681n(a)(2);

E. A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that Dr. Sroufe owes nothing on the $3,600.00 cash advance or its associated interest, fees, and charges; an order that Wells Fargo cease all collection of those amounts; and an order that Wells Fargo direct all consumer reporting agencies to delete or correct its reporting of the account;

F. His costs and reasonable attorney's fees under 15 U.S.C. §§ 1693m(a)(3), 1640(a)(3), 1681n(a)(3), and 1681o(a)(2); and

G. Pre- and post-judgment interest as allowed by law, and such other and further relief as is just.

## JURY DEMAND

Dr. Sroufe demands trial by jury on all claims so triable. Fed. R. Civ. P. 38(b).

Dated: August 18, 2026

**Johnson Consumer Law PLLC**

By: */s/ Brian E. Johnson*
Brian E. Johnson (VSB No. 92815)
40716 Keesling Farm Lane
Lovettsville, VA 20180
P: 540.518.8953
F: 540.985.4365
brian@johnsonconsumerlaw.com
**Counsel for Plaintiff**